**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

IVAN DENNINGS CALES,

      Petitioner,

v.                                          Civ. No. 22-723 WJ/KK

STATE OF NEW MEXICO, *et al.*,

      Respondents.

### MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

In 2016, a jury convicted Petitioner Ivan Cales of first-degree murder and one count of tampering for which he was sentenced to a term of life imprisonment. (Doc. 21-2 at 92-93, 98.) The New Mexico Supreme Court affirmed the convictions, and a state court later denied his petition for habeas relief. (*Id.* at 238-56, Doc. 21-3 at 1-527.) Now before the Court is Mr. Cales's *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) ("Petition"), filed September 26, 2022, in which Mr. Cales seeks a reversal of his murder conviction. Having carefully considered the parties' submissions, the record, and the relevant law, I recommend that the Court DENY Mr. Cales's Petition and DISMISS this matter with prejudice.

### I. BACKGROUND[2]

**A. Disappearance of Roxanne Houston and Recovery of her Remains**

Roxanne Houston and her partner Johnny Lee Hanson were homeless in Colorado before moving to New Mexico in July 2013, eventually settling on unoccupied land in the Two Peaks

---

[1] On November 2, 2023, United States District Judge William P. Johnson referred this case to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. (Doc. 30.)

[2] The Court derives the following background from the evidence presented at Mr. Cales's trial.

area of Carson, New Mexico, in March 2014. (Doc. 22, March 14, 2016, Jury Trial at 2:28:06-2:38:48.) The couple sought to start a community on this land and allowed others to stay on the property, later establishing a council so that the occupants could have a say in the running of the community. (*Id.* at 2:45:06-2:50:30.) Mr. Cales arrived at Ms. Houston and Mr. Hanson's property later in the spring of 2014 and became a member of the council after staying there for approximately one month. (*Id.* at 2:50:33-2:54:06.) Mr. Cales had a Jeep Cherokee that he would use to run errands. (*Id.* at 2:52:40-2:53:05.)

On June 12, 2014, Mr. Hanson and Ms. Houston argued over her ongoing relationship with a former partner, Vernon McCune. As a result of the argument, Mr. Hanson left the property for a few days.[3] (Doc 22, March 14, 2016, Jury Trial at 2:59:32-3:01:11; March 15, 2016, Jury Trial at 10:54:13-10:54:26.) Ms. Houston left the property the next day and had not returned by the time Mr. Hanson arrived back on June 14, 2014. (Doc 22, March 14, 2016, Jury Trial at 3:13:46-3:14:54; March 15, 2016, Jury Trial at 10:54:13-10:59:35, 11:57:07-11:58:23.) After several weeks had passed, Mr. Hanson filed a missing person report regarding Ms. Houston. (Doc. 22, March 15, 2016, Jury Trial at 11:13:35-11:13:55.)

In December 2014, hikers discovered a bone in a dry creek bed in Carson. (Doc. 22, March 16, 2016, Jury Trial at 11:34:21-11:39:06.) When authorities arrived at the site, they found a partially charred bra less than twenty feet from the bone. (*Id.* at 11:40:27-11:41:02.) Upon further investigation of the site, authorities discovered an almost completely decomposed skeleton lying in a shallow grave. (*Id.* at 11:58:49-11:59:52.) The authorities later identified the remains as those

---

[3] Mr. Hanson testified that his departure was related to a tenet the couple had previously established in their relationship in which he would grant Ms. Houston a separation period to decide whether she wanted to remain in the relationship. (Doc. 22, March 14, 2016, Jury Trial at 3:07:22-3:09:14.)

of Ms. Houston. (*Id.* at 4:46:38-4:47:47.) Further, a crime scene investigator surmised that Ms. Houston's remains had been above ground for an undetermined period of warmer weather before being placed in the grave based on the presence of snow under the remains and because the first snowfall of the fall season in that area occurred on October 28, 2014. (Doc. 22, March 17, 2016, Jury Trial at 1:57:20- 1:58:56, 2:14:54-2:16:00.) A forensic pathologist discovered an opening in the forehead of Ms. Houston's skull consistent with a bullet wound and a bullet lodged in the back of her skull. (*Id.* at 2:32:45-2:47:35.) The forensic pathologist determined the cause of death to be "homicidal violence including a gunshot wound of the head" and the manner of death to be homicide. (*Id.* at 2:53:13-2:53:36.)

## B.  Evidence Supporting Mr. Cales's First-Degree Murder Conviction

The following facts were produced through witnesses and exhibits at Mr. Cales's trial. On June 13, 2014, the day that Ms. Houston left the property, Mr. Cales confronted her about unspecified lies she had told. (Doc. 21-2 at 18-25.)[4] Brandon Hethcox, another resident of the property, described an encounter he had with Mr. Cales later that day. According to Mr. Hethcox, Mr. Cales told him he was suspicious of Ms. Houston, that Ms. Houston was lying and should not be trusted, and that she was "bat s-h-i-t crazy". (Doc. 22, March 15, 2016, Jury Trial at 11:52:49-11:53:19.) Mr. Cales later told police that he then left the property to go camping and returned the next day. (Doc. 21-2 at 24-25.)

Mr. Hanson testified that, after he returned to the property on June 14, 2014, Mr. Cales described his conflict with Ms. Houston, telling Mr. Hanson that he intended to vote Ms. Houston

---

[4] This evidence was introduced through Mr. Cales's statements made in a video recording of a police interview, which is not audible in the recording of the trial. (*See* Doc. 22, March 17, 2016, Jury Trial at 9:50:33-10:31:20.) I therefore rely on the certified transcript of the police interview. (*See* Doc. 21-2 at 4-61.)

out of the community council. (Doc. 22, March 15, 2016, Jury Trial at 9:12:19-9:13:45.) Mr. Cales also showed a pistol he owned to Mr. Hanson, tried to put it in his hand, and wanted him to shoot it. (Doc. 22, March 14, 2016, Jury Trial at 2:58:13-2:58:40; March 15, 2016, Jury Trial at 9:25:28-9:26:23.) Multiple witnesses testified that they did not know of any other individual on the property who owned a gun. (Doc. 22, March 15, 2016, Jury Trial at 1:43:14-1:45:59; March 16, 2016, Jury Trial at 9:38:37-9:39:47.)

In addition, Mr. Hanson testified that Mr. Cales told him that he had "blown … up" his jeep, meaning that he had damaged it, while driving in a nearby recreational area. (Doc. 22, March 15, 2016, Jury Trial at 9:12:19-9:13:45.) However, Mr. Hanson testified that Mr. Cales's jeep was still running for at least a week after Ms. Houston's disappearance. Mr. Hanson testified that he noticed a strange odor while riding in the jeep during this period—a smell Mr. Cales attributed to a dead rat. (*Id.* at 9:17:12-9:17:58.) Mr. Hanson stated that, although he never actually witnessed Mr. Cales clean the jeep, Mr. Cales had asked him for bleach, used all his organic degreaser, and eventually succeeded in removing the smell from the jeep. (*Id.* at 9:18:05-9:22:12, 11:07:59-11:09:07.)

In mid-July 2014, Mr. Cales left the property following an altercation with Mr. Hanson. (*Id.* at 9:23:36-9:25:27, 9:26:45-9:26:55.) At the time Mr. Cales left, his jeep had broken down, and he later sent Mr. Hanson the title to the vehicle along with a letter explaining that he was giving it to him because he did not expect to get it running again. (*Id.* at 9:27:12-9:27:25.) Following his departure from Mr. Hanson's property, Mr. Cales relocated to the property of Michael Thebo in the Three Peaks area of Carson, New Mexico, where he remained from September 2014 to February 2015. (Doc. 22, March 15, 2016, Jury Trial at 2:27:26-2:33:15.)

When he first moved onto Mr. Thebo's property, Mr. Cales asked Mr. Thebo if he could have a firearm there and informed Mr. Thebo that he owned a Russian military surplus pistol called a "Tokarev." (*Id.* at 2:34:34-2:34:59.) Mr. Thebo commented to Mr. Cales that this type of pistol can fire rounds that "will go through a [bulletproof] vest," to which Mr. Cales replied, "Yeah, those things will go through a head too." (*Id.* at 2:35:00-2:35:12, 2:37:13-2:37:53.) A witness who lived on Mr. Thebo's property in a structure with Mr. Cales testified that Mr. Cales kept his pistol in a "lock box." (Doc. 22, March 16, 2016, Jury Trial at 11:05:35-11:05:47.) In January 2015, Mr. Cales asked Mr. Thebo, "If somebody had wanted to change the forensics of a pistol all they would have to do is buy a new barrel and change it out, right?" (Doc. 22, March 15, 2016, Jury Trial at 2:42:50-2:44:30.)

Mr. Thebo also described conversations he had with Mr. Cales regarding Mr. Cales's Native American heritage and related beliefs. Specifically, Mr. Cales stated that (1) he was 1/32 Cherokee and a member of the Lenape tribe; (2) he had no problem with wiccans like Mr. Thebo but distrusted witches; (3) witches were "evil" and likened them to "skin walkers"—a term Mr. Thebo clarified as referring to an "evil Navajo witch"; (4) "if a Native found a skin walker they would kill them"; and (5) "if he were cursed … he would feel justified in killing the person who cursed him to break the curse." (*Id.* at 2:48:08-2:50:21, 3:52:37-3:54:25.)

On February 2, 2015, Detective Robert Salazar stopped Mr. Thebo's vehicle in Taos, New Mexico, while Mr. Cales was riding in it as a passenger. (Doc. 22, March 15, 2016, Jury Trial at 2:44:52-2:45:17; *see* Doc. 21-2 at 4.) Before Detective Salazar approached the vehicle, Mr. Cales told Mr. Thebo, "Don't tell them about the gun—I'm not supposed to have it." (Doc. 22, March 15, 2016, Jury Trial at 2:46:14-2:46:25.) During the stop, Mr. Cales agreed to follow Mr. Salazar to the police station to discuss Ms. Houston's disappearance. (*Id.* at 2:45:46-2:46:07; *see* Doc. 21-

2 at 4-6.) At the police station interview, Mr. Cales admitted that he cleaned his vehicle after Ms. Houston disappeared, denied being responsible for her disappearance, and denied owning any handgun. (Doc. 21-2 at 18, 27, 32-33.)

During the interview, Detective Salazar also explained to Mr. Cales that he may seek a DNA sample from him.  (*Id.* at 53-58.) Mr. Cales agreed to submit DNA and volunteered that he had been collecting firewood with Mr. Hanson in the Two Peaks area in early July when he discovered a partially burned bra and a bone, briefly handled those objects, and pointed out his discovery to Mr. Hanson. (*Id.* at 53-58.) Mr. Hanson denied that he had ever discussed a bone or bra while on a trip to collect firewood with Mr. Cales. (Doc. 22, March 15, 2016, Jury Trial at 9:22:13-9:23:29.)

Several days after this initial interview, Detective Salazar contacted Mr. Cales to schedule a second interview, and Mr. Cales agreed to meet with him the following day. (Doc. 22, March 18, 2016, Jury Trial at 10:08:37-10:09:24.) However, Mr. Cales left Mr. Thebo's property later that night. (Doc. 22, March 15, 2016, Jury Trial at 2:50:42-2:51:17; March 16, 2016, Jury Trial at 11:07:14-11:11:54.) When Mr. Cales did not show up to the interview, Detective Salazar visited Mr. Thebo's property, recovered the pistol Mr. Cales had traded to the other resident, and submitted the pistol to the police crime lab for processing. (Doc. 22, March 18, 2016, Jury Trial at 10:10:27-10:11:47.) He also recovered a calendar belonging to Mr. Cales with a notation on June 13, 2014, stating, "Roxanne leaves Johnnie's[.]" (Doc. 22, March 15, 2016, Jury Trial at 3:36:25-3:37:45.) A November 26 entry stated "DRE–woman with skeletal left arm," with "DRE = Dream" written elsewhere on the page. (*Id.* at 3:34:10-3:34:45, 3:41:50-3:42:30.)

A ballistics expert examined the bullet recovered from Ms. Houston's skull and determined it was a .30 caliber nominal bullet, a category that includes the 7.62 x 25 ammunition used in a

6

Tokarev pistol. (Doc. 22, March 17, 2016, Jury Trial at 3:58:11-4:06:30, 5:19:02-5:19:45.) The ballistics expert compared the recovered bullet to a bullet that she test-fired from the pistol submitted by Detective Salazar, which she identified as a Tokarev. (*Id.* at 4:26:30-4:27:45, 4:55:27-4:57:45.) Based on this comparison, the ballistics expert could not definitively identify Mr. Cales's pistol as the gun that fired the recovered bullet due to its degradation. (*Id.* at 4:45:02-4:46:58, 4:55:27-4:57:45.)   The ballistics expert also found that the test-fire bullet and the recovered bullet shared the same class characteristics[5] and bore similarities when examined microscopically. (*Id.* at 4:45:02-4:46:58, 4:55:27-4:57:45.) The expert concluded that she could not eliminate Mr. Cales's pistol as the weapon that fired the recovered bullet. (*Id.* at 4:55:27-4:57:45.)

Detective Salazar executed an arrest warrant for Mr. Cales in late February 2015, taking Mr. Cales into custody in Santa Fe, New Mexico. (Doc. 22, March 18, 2016, Jury Trial at 10:12:46-10:13:20.) At the time of arrest, Mr. Cales had cut his hair, grown a beard, and, when arrested, acted as if he was unable to speak. (*Id.* at 10:13:20-10:13:46.)

Raymond Martinez, an inmate housed with Mr. Cales during his period of pretrial detention, testified regarding their interactions while incarcerated together. Specifically, Mr. Martinez testified that Mr. Cales told him Ms. Houston was a witch who practiced witchcraft. (Doc. 22, March 16, 2016, Jury Trial at 3:52:59-3:54:41.) Mr. Martinez further testified that Mr.

---

[5] The ballistics expert explained that gun manufacturers design gun barrels with various rifling patterns that are imparted onto a bullet as "lands" and "grooves." (Doc. 22, March 17, 2016, Jury Trial at 3:56:28-3:58:00.) The "class characteristics" of a gun can be determined by the number and size of the lands and grooves imparted on the bullet after firing, the direction those lands and grooves twist, and the diameter of the bullet. (*Id.* 3:58:28-4:05:10.) After observing the relevant characteristics of the recovered bullet to determine the class characteristics of the gun that fired it and entering this information in a database, the ballistics expert was able to generate a non-exhaustive list of thirteen guns that matched the class characteristics found on the recovered bullet. (*Id.* at 4:03:11-4:08:00.)

Cales had shown him drawings depicting Native American figures, including one admitted into evidence that contained the caption "witch hunter[.]"[6] (*Id.* at 3:51:45-3:57:46.) Mr. Cales also told Mr. Martinez about an incident where he "felt something while he was asleep" and awoke to find Ms. Houston waving her hands over him and mouthing silently, which made Mr. Cales upset and angry. (*Id.* at 3:57:56-3:59:19.)

## C.  Procedural Background

At trial, a jury found Mr. Cales guilty of first-degree murder and one count of tampering with evidence related to his burying of Ms. Houston's body.[7] (Doc. 21-2 at 92-93.) The state district court sentenced Mr. Cales to a term of life imprisonment for the first-degree murder charge and six years imprisonment for the tampering charge to be served concurrently with his life sentence. (*Id.* at 98.) Represented by counsel, Mr. Cales appealed his conviction to the New Mexico Supreme Court on October 27, 2017,[8] arguing that (1) the trial court erred by denying his pre-trial motion to suppress a second videorecorded police interview statement made without proper Miranda warnings and by playing approximately ten minutes of this statement to the jury before excluding the rest of it; (2) there was insufficient evidence to establish that Mr. Cales acted with the requisite intent to support a first-degree murder charge; (3) the trial court erred when it admitted character evidence contrary to New Mexico Rule of Evidence 11-404; (4) trial counsel

---

[6] While the record contains photocopies of several drawings captioned with variations on the phrase "witch hunter" (*see* Doc. 21-1 at 68-69, 110-12), it is unclear which if any of these drawings was the one admitted into evidence. (*See* Doc. 22, March 16, 2016, Jury Trial at 3:53:00-3:57:46, 4:21:15-4:21:50.)

[7] The jury found Mr. Cales not guilty on an additional count of tampering with evidence related to Mr. Cales trading away the pistol implicated in Ms. Houston's homicide. (Doc. 21-2 at 94.)

[8] Under New Mexico law, "appeals from the district courts in which a sentence of death or life imprisonment has been imposed" must be made directly to the New Mexico Supreme Court. NMRA 12-102(1). Accordingly, on October 26, 2016, the New Mexico Court of Appeals transferred Mr. Cales direct appeal to the New Mexico Supreme Court. (Doc. 21-2 at 137-38.)

was ineffective for not moving for a mistrial when the district court played part of Mr. Cales's second interview; and (5) the trial court's errors taken together constituted cumulative error. (*Id.* at 139-154; *see* Doc. 21-1 at 27-34; Doc. 22, March 18, 2016, Jury Trial at 10:15:14-11:08:34.)[9]

On July 16, 2018, the New Mexico Supreme Court affirmed Mr. Cales's convictions. (Doc. 21-2 at 238-256.) Regarding the videotaped police interview, the court determined that, although the trial court erred in admitting the video, this error was harmless because the portion of the interview that was presented to the jury did not contain incriminating statements, and the court issued a prompt curative instruction. (*Id.* at 247-250.) On the sufficiency of evidence claim, the court found sufficient evidence supporting Mr. Cales's deliberate intent to kill Ms. Houston, including (1) his animus toward Ms. Houston based on his professed Native American beliefs about witchcraft and his documented statements and drawings depicting the justified killing of those he considered witches; (2) Ms. Houston's "execution-style" killing with a gun similar to one owned by Mr. Cales; (3) Mr. Cales's boasts that the gun could go through a person's head; (4) Mr. Cales's false statement to police that he did not own a handgun; and (5) his attempts to evade capture. (*Id.* at 242-244.) The court rejected Mr. Cales's character evidence challenge, ruling that testimony regarding his drawings and beliefs about witches was properly admitted because it was not offered to prove his general character but rather to establish his specific motive and deliberate intent to kill Ms. Houston. (*Id.* at 250-251.) Regarding the ineffective assistance claim, the court concluded that trial counsel's failure to move for a mistrial following the video playback did not constitute ineffective assistance because the initial admission of the video was harmless and

---

[9] On April 12, 2018, while this appeal was pending, Mr. Cales filed a *pro se* petition for writ of habeas corpus in state district court that raised similar arguments to those made on direct appeal. (*See* Doc. 21-2 at 208-17.) On July 16, 2018, the state trial court denied Mr. Cales's state habeas petition without prejudice because it had not yet decided his direct appeal. (Doc. 21-2 at 255-56.)

properly remedied by the court's curative instruction. (*Id.* at 251-252.) Finally, the court dismissed Mr. Cales's cumulative error argument, finding that there could be no cumulative error because it had not found prejudicial errors, as noted above. (*Id.* at 252-253.)

On December 13, 2018, Mr. Cales filed a *pro se* petition for writ of habeas corpus in state district court, (Doc. 21-3 at 1-11) which he supplemented on February 5, 2019.  On October 13, 2020, counsel then representing Mr. Cales filed an amended petition, incorporating Mr. Cales's *pro se* petition and its supplement. (Doc. 21-3 at 136-171.) In the amended petition, Mr. Cales asserted that his rights were violated through (1) the ineffective assistance of counsel at trial, which included trial counsel's failures to investigate Mr. Cales's unspecified "central defense," pursue potentially meritorious but unspecified pre-trial motions, retain expert witnesses, request instructions on lesser-included offenses, and opposition to a continuance when new evidence was discovered just before trial; (2) the ineffective assistance of counsel on appeal; (3) prosecutorial misconduct; (4) the denial of his right to testify on his own behalf based on trial counsel's failure to adequately advise him of this right; and (5) a fundamental error that deprived him of due process and a fair trial. (*Id.* at 146-154.)

On April 13, 2021, the state district court dismissed all claims in the amended petition except Mr. Cales's claim related to his right to testify. (Doc. 21-3 at 275-279.) Following a hearing on the right-to-testify claim, the state district court dismissed that claim on October 27, 2021. (Doc.21-3 at 286-90.) The state district court first found that trial counsel had been deficient because the decision to testify is not a tactical one, but one that rests with the accused, and that trial counsel's decision to prevent Mr. Cales from testifying was "unilateral." (*Id.* at 288.) The state district court went on, however, to analyze whether trial counsel's decision prejudiced Mr. Cales and considered whether there would have been "a reasonable probability that the result of

the trial would have been different" if Mr. Cales had testified as described in his affidavit in support of his state habeas petition and as he testified during the evidentiary hearing. (*Id.* at 289.) Ultimately, the state district court found that Mr. Cales had failed to demonstrate that the outcome of his trial would have been different had he testified. (*Id.* at 286-90; *see* Doc. 22, August 5 Evidentiary Hearing.) On December 20, 2021, Mr. Cales filed a petition for writ of certiorari with the New Mexico Supreme Court seeking review of the state district court's dismissal of his amended petition. (Doc. 21-3 at 291-305.) On February 17, 2022, the New Mexico Supreme Court denied his certiorari petition. (Doc. 21-3 at 527.)

In the present Petition, Mr. Cales argues that his murder conviction should be overturned on the grounds that (1) there was insufficient evidence to support his first-degree murder conviction because the evidence did not demonstrate that he acted with the requisite intent; (2) he received ineffective assistance of counsel at trial; (3) the prosecution engaged in prosecutorial misconduct by allowing witnesses to give false testimony without correction; (4) the trial court allowed Mr. Martinez to testify regarding Mr. Cales's character in violation of New Mexico's evidentiary rules; and (5) his right to testify was violated when trial counsel did not explain his right to testify and barred him from testifying. (Doc. 1 at 1-41.) On October 11, 2023, Respondents filed an Answer in which they stipulated that Mr. Cales had exhausted his state court remedies for the grounds for relief raised in the Petition, waived exhaustion requirements for any new evidence in the Petition supporting his claims, and argued that his claims lacked merit. (Doc. 21.) Mr. Cales filed a Reply on November 27, 2023. (Doc. 31.)

## II. LEGAL STANDARDS

## A.  Standard of Review

Under 28 U.S.C. § 2254, a federal court may only grant a state prisoner's petition for a writ of habeas corpus when the prisoner is held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In general, the prisoner must also have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1). When the prisoner's claims have been adjudicated on the merits in state court, a Section 2254 petition can only be granted if the state court's decision was contrary to or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision "unreasonably applies" clearly established federal law if it "correctly identifies the governing legal principle from [United States Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "Where … the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application of [United States Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (internal quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-

12

by-case determinations." *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (brackets omitted).

Federal review of a state court's determination that a claim lacks merit is "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)). A state court decision that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough*, 541 U.S. at 664). The state court need not cite to United States Supreme Court cases, or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Indeed, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning" at all. *Harrington*, 562 U.S. at 98.

Unless the state court indicated that it did not consider an issue on the merits, even a summary denial will be deemed "on the merits" for purposes of Section 2254 review. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004); *see Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated."). Where the highest state court denies discretionary review from a lower court's dismissal of a habeas petition, but does so without providing reasons, the federal habeas court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

Review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180-81, 185 n.7; *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012). Such review must be "highly deferential," and the petitioner bears the burden of proof. *Cullen*, 563 U.S. at 181; *Woodford,* 537 U.S. at 24-25.

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be…. [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

*Harrington*, 562 U.S. at 102-03 (citation and quotation marks omitted).

In Section 2254 proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Welch*, 639 F.3d at 991 ("We presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by clear and convincing evidence."). A petitioner is entitled to an evidentiary hearing when "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 858 (10th Cir. 2005). However, factual allegations must be "specific and particularized, not general or conclusory." *Id.* at 859. "Moreover, an evidentiary hearing is unnecessary if the claim can be resolved on the record." *Id.* at 859.

> [B]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. In practical effect ... this means that when the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing.

*Cullen*, 563 U.S. at 183 (citations and quotation marks omitted).

## B. Liberal Construction of *Pro Se* Petitions

Because Mr. Cales is a *pro se* litigant, I construe his filings liberally and hold them to a less stringent standard than is required of a party represented by counsel. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Liberal construction requires courts to make some allowance for a *pro se* litigant's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements[.]" *Garrett v. Selby Connor Maddox & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). However, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id.*

### III. ANALYSIS

## A. Insufficient Evidence

In his direct appeal, Mr. Cales asserted that "the evidence of his intent to commit first degree murder was insufficient." (Doc. 21-2 at 150-51.) The New Mexico Supreme Court rejected this claim, stating the following:

> The State presented the following evidence to Cales' jury in support of its claim that Cales killed the victim with deliberate intent. Cales expressed interest in Native American philosophy and the history and lore of 'skinwalkers' or Native American witches. Cales stated that, 'if a native found [a skinwalker,] that they would kill them.' Cales made a detailed drawing of a Native American 'witch hunter' walking away from a slain body.[10] Cales made remarks that Native Americans kill witches who curse people and that he would feel justified in

---

[10] Mr. Martinez never describes the depiction of a person slaying a witch in his testimony identifying Mr. Cales's drawings, and it is unclear from the trial record which of Mr. Cales's drawings was ultimately admitted into evidence. (Doc. 22, March 16, 2016, Jury Trial at 3:47:30-4:28:11); *see* Note 5, *supra*. The record does contain a drawing with the caption "witch kill." (*See* Doc. 21-1 at 111.) In that drawing, a Native American figure appears to be walking away from a slumped-over figure who has been shot by an arrow. (*See id*.) However, this drawing is apparently not the drawing that Mr. Martinez identified, as the identified drawing contained the caption "witch hunter." (*See* Doc. 22, March 16, 2016, Jury Trial at 3:55:17-3:55:36, 4:20:10-4:20:28.)

> killing someone who cursed him. Cales claimed to be part Native American. He also claimed that the victim once made spell-casting motions over him with her hands, and he considered the victim to be a witch and a practitioner of witchcraft. Cales harbored animus towards the victim and frequently stated that he did not trust her. Cales' jury was provided with the following additional evidence.
>
> The victim was killed by a single gunshot to the center of her forehead. Witnesses testified that Cales possessed a distinctive and high-powered handgun. Cales boasted-after the victim's disappearance-that his handgun could fire a projectile through someone's head. Yet, Cales informed law enforcement that he did not own a handgun. The State's forensic expert testified that, although she could not say with any certainty that the handgun Cales possessed fired the bullet that killed the victim, she observed similarities between test bullets fired from Cales' handgun and the bullet found in the victim's skull. Lastly, … Cales' jury also learned that he slipped away before attending a follow-up police interview, went into hiding, drastically changed his appearance, and pretended to be mute when officers finally encountered him again.
>
> The evidence discussed above is sufficient to support the jury's determination that Cales acted with deliberate intention when he killed the victim. That evidence showed that Cales had reason to kill the victim, murdered her in an execution style, lied about owning the type of weapon that was used to perpetrate the killing, and attempted to evade capture for his offense.

(*Id.* at 242-43.) Mr. Cales reasserts his insufficient evidence claim in the present Petition, arguing that the prosecution "lack[ed] proof of a deliberate and premeditated killing," arguing that there was no direct evidence he engaged in a deliberate and premeditated killing during his trial and that the evidence summarized by the New Mexico Supreme Court was "speculative." (Doc. 1 at 40.)

Under federal law, "evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). The New Mexico Supreme Court applied this rule. (Doc. 21-2 at 241-42.) On federal habeas review, a "state-court decision rejecting a sufficiency challenge may" be overturned only if the "decision was 'objectively unreasonable.'" *Parker*, 567 U.S. at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2,

16

(2011)). Hence, the question before the Court is whether the New Mexico Supreme Court "reasonably decided that a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Torres v. Lytle*, 461 F.3d 1303, 1313 (10th Cir. 2006) (quoting *Jackson*, 443 U.S. at 319)).

The crime of first degree murder that Mr. Cales was convicted of has the following essential elements: 1) the defendant killed the victim, 2) the killing was with the deliberate intention to take away the life of the victim, and 3) the killing happened in New Mexico on a specific date. NMSA 1978, Section 30-2-1(A)(1) (1994) and UJI 14-201 NMRA (Willful and Deliberate Murder; Essential Elements).  New Mexico law establishes, and the Cales jury was instructed that:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

(Doc. 21-2 at 86), UJI 14-201.

After thorough review of the state court record, I find that the New Mexico Supreme Court reasonably determined that there was sufficient evidence of Mr. Cales's deliberate intent to kill Ms. Houston to support his first-degree murder conviction. During Mr. Cales's trial, the prosecution presented evidence that he (1) had an altercation with Ms. Houston just prior to her disappearance wherein he confronted her about lying; (2) held the beliefs that he would be justified in killing a witch who had cursed him and that Ms. Houston was a witch who practiced witchcraft; (3) had an encounter with Ms. Houston where he awoke to find her waving her hands over him and mouthing silently, and that this upset and angered him; and (4) had drawn a depiction of witch

17

hunting that included a witch hunter and a deceased witch. (Doc. 21-2 at 18-25; Doc. 22, March 15, 2016, Jury Trial at 11:52:49-11:53:19, 2:48:08-2:50:21, 3:52:37-3:54:25; March 16, 2016, Jury Trial at 15:52:59-3:54:41, 3:57:56-3:59:19, 3:51:45-3:57:46.) Based on this evidence, a jury could have reasonably found that Mr. Cales killed Ms. Houston and that the killing was a premeditated act motivated by his personal beliefs about witches and witchcraft and/or his personal animosity toward her.

In addition, the prosecution presented evidence that Mr. Cales lied about owning a gun and evidence of false exculpatory statements may be "admissible to prove circumstantially consciousness of guilt or unlawful intent." *United States v. Zaya*, 2025 WL 648232, at *3-4 (10th Cir. 2025) (noting that defendant's false statements about what she did on the day the decedent died could be used by the jury to infer that she attempted to cover up what she had done). Finally, the forensic pathologist's testimony that Ms. Houston's cause of death was homicidal violence including by a gunshot wound to the forehead was evidence from which a reasonable trier of fact could conclude Ms. Houston was murdered execution style and that her killer acted with the deliberate intent to take her life. (Doc. 22, March 17, 2016, Jury Trial at 2:32:45-2:47:35, 2:55:21-2:56:12; *see* Doc. 21-2 at 86.)

While reasonable minds might differ on the strength of the evidence, fairminded jurists could reasonably conclude that a rational jury could find from all of the facts and circumstances of and surrounding the killing, that Mr. Cales killed Roxanne Houston with the deliberate intent to take away her life. *See United States v. Smith*, 135 F.4th 905, 913 (10th Cir. 2025) (upholding murder conviction on direct appeal based on the accumulation of circumstantial evidence, including defendant's altercation with decedent, opportunity and means to commit the murder, and

false exculpatory statements made during the investigation of the murder, including lying about the murder weapon and explanations of the crime scene).

Finally, to the extent Mr. Cales argues that circumstantial evidence described by the New Mexico Supreme Court was insufficient to establish his guilt beyond a reasonable doubt because no direct evidence established his intent, this argument is unavailing under both New Mexico state law as described above, and federal law which permit circumstantial evidence to support a criminal conviction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)); UJI 14-201 NMRA (a deliberate intention to take away the life of a murder victim "may be inferred from all of the facts and circumstances of the killing.")

In short, the New Mexico Supreme Court's conclusion was not objectively unreasonable, and I therefore recommend that the Court DENY Mr. Cales's request for relief on this ground. *See Parker*, 567 U.S.at 43; *Torres*, 461 F.3d at 1313; *Harrington*, 562 U.S. at 105.

## B.  Ineffective Assistance of Counsel

Mr. Cales asserts that his trial counsel provided him with constitutionally ineffective assistance by failing to (1) retain an expert witness to rebut the prosecution's ballistics expert; (2) investigate and pursue a pretrial motion to suppress the pistol evidence; (3) investigate news articles that would have demonstrated the falsity of Detective Salazar's testimony that Mr. Cales possessed knowledge of unpublished crime scene details; (4) question Mr. Cales about writings seized from his jail cell along with his drawings; and (5) question him about his belief that he was "set up" for Ms. Houston's murder. (Doc. 1 at 5, 33-36.) Additionally, the Petition asserts that the Court should overturn Mr. Cales's conviction based on a "due process" violation arising from trial counsel's failure to adequately inform Mr. Cales of his right to testify (*Id.* at 10, 39.)

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). For a defendant to succeed on a claim of ineffective assistance of counsel, he must demonstrate both that "counsel's representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Id.* at 687-88. In applying this two-pronged test, courts "may address the performance and prejudice components in any order, but need not address both if [the defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998). The *Strickland* test is clearly established federal law within the meaning of Section 2254(d). *Cullen*, 563 U.S. at 189. However, "*Strickland* created a general standard, thus giving 'a state court … more latitude to reasonably determine that a defendant has not satisfied that standard.'" *Welch*, 639 F.3d at 1010 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Regarding the first *Strickland* prong,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689. Judicial review of counsel's performance is "highly deferential," *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011); and, a defendant must overcome the "strong presumption" that his counsel "made all significant decisions in the exercise of reasonable professional judgment" and that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689-90. Courts are required not only to give defense counsel "the benefit of the doubt," but also to "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen*, 563 U.S. at 196

(quotation marks omitted). "It is rare that constitutionally competent representation will require any one technique or approach." *Id.* at 195 (quotation marks and brackets omitted).

When asserting an ineffective assistance of counsel claim that the state courts have already rejected on the merits, the petitioner's burden is even heavier. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations and quotation marks omitted); *see also Cullen*, 563 U.S. at 190 (review of *Strickland* claim under Section 2254(d) is "doubly deferential").

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

Regarding the second *Strickland* prong, in turn, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Thus, "[t]o establish *Strickland* prejudice a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quotation marks omitted).

> This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Harrington*, 562 U.S. at 111-12 (citations and quotation marks omitted). Further, "the *Strickland* prejudice prong may not be satisfied through speculation." *Moore v. McKune*, 534 F. App'x 712,

724 (10th Cir. 2013). I address each of Mr. Cales's ineffective assistance of counsel claims in light of the foregoing standards, and for the reasons stated below, find that none has merit.

### 1.    Failure to Retain Ballistics Expert

Mr. Cales first claims that his trial counsel provided him with constitutionally ineffective assistance by failing to retain a ballistics expert to cast doubt on the prosecution's theory that Mr. Cales killed Ms. Houston with a "point blank execution shot." (Doc. 1 at 5, 33; *see* Doc. 22, March 18, 2016, Jury Trial at 3:18:20-3:18:32 (prosecution's closing argument asserting that Mr. Cales had shot Ms. Houston "execution-style" through the forehead.)) According to Mr. Cales, had trial counsel retained an expert witness, the witness would have testified that the high-velocity ammunition Mr. Cales used with his pistol would have passed completely through Ms. Houston's skull had it been fired at point blank range, thus undermining the prosecution's contention that Mr. Cales's pistol was the murder weapon. (Doc. 1 at 5, 33.)

The state district court rejected this argument in ruling on his amended state habeas petition, finding that Mr. Cales failed to demonstrate any prejudice resulting from trial counsel's failure to retain a ballistics expert because (1) he did "not provide[] any supporting documentation beside his belief that another expert would eliminate the possibility that his firearm was the murder weapon"; and (2) there was insufficient evidence to suggest that "another expert would have changed the ultimate determination that [Mr. Cales] fired *a gun* that killed the victim." (Doc. 21-3 at 277) (emphasis in original).

A habeas petitioner asserting that he was prejudiced by trial counsel's failure to offer testimony must base this claim on evidence rather than mere speculation on how a witness would have testified. *Bunton v. Atherton*, 613 F.3d 973, 983 (10th Cir. 2010) (finding a habeas petitioner

22

did not demonstrate prejudice from trial counsel's failure to call a witness because he did not present an affidavit from the witness confirming how she would testify); *see Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008) (rejecting a petitioner's argument that a medical expert would have provided testimony contrary to the prosecution's theory because "[h]e supplied no evidence or convincing argument that medical testimony could support his claim.")

Here, Mr. Cales does not provide evidence, such as an affidavit from a potential ballistics expert to substantiate his claim that his gun could not have been the murder weapon because any bullet fired from it would have passed through the victim's skull. (Doc. 1, at 5, 33.) Mr. Cales's speculation does not establish that he was prejudiced by trial counsel's failure to call a ballistics expert. I find that the state district court acted reasonably and in accordance with clearly established federal law in rejecting Mr. Cales' claim that his counsel was constitutionally ineffective in failing to retain a ballistics expert. *See Strickland*, 466 U.S. at 694.

2.  Failure to Move to Suppress Pistol Evidence

Mr. Cales argues for the first time in the Petition[11] that his trial counsel provided him with ineffective assistance by failing to file a pre-trial motion to suppress the ballistic expert's opinion evidence because it was speculative and unreliable in violation of New Mexico Rule of Evidence 11-702.[12] (Doc. 1 at 34.) Because Mr. Cales did not assert this claim in state court, there is no state

---

[11] As noted previously, Respondents waived the AEDPA's exhaustion requirement and addressed all of Mr. Cales's claims on the merits. (Doc. 21 at 10.)

[12] Mr. Cales also argues more generally that he received ineffective assistance because "trial counsel failed to investigate and pursue potentially meritorious pre-trial motions." (Doc. 1 at 34.) The state district court rejected this argument when Mr. Cales raised it in his amended state habeas petition because Mr. Cales failed to indicate which pre-trial motions should have been filed. (Doc. 21-3 at 276.) I similarly find that this conclusory allegation is insufficient to raise ineffective assistance claim and will not address it further. *See Quintana v. Mulheron*, 788 F. App'x 604, 609 (10th Cir. 2019) ("We have repeatedly held that conclusory allegations are insufficient to warrant habeas relief for ineffective assistance of counsel.").

decision on the claim to which to defer. (*See* Doc. 21-2 at 139-154; Doc. 21-3 at 136-171.) I therefore review the merits of this claim *de novo*. *See Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009).

However, Mr. Cales's does not develop an argument in support of this claim, offering no explanation regarding why the ballistics expert's opinion was speculative and unreliable and therefore inadmissible. (*See* Doc. 1 at 34.) Consequently, Mr. Cales has not demonstrated that trial counsel acted unreasonably in declining to file such a motion, which would be necessary to satisfy the first *Strickland* prong. Nor has he shown that such a pretrial motion would have been successful, which would be necessary to establish prejudice under the second *Strickland* prong. I therefore recommend that the Court DENY Mr. Cales's request for relief on this ground.

3. Failure to Investigate News Articles Describing the Discovery of Ms. Houston's Remains

Mr. Cales next asserts that trial counsel provided ineffective assistance by failing to investigate news articles that would have demonstrated that Detective Salazar provided false testimony when he stated that Mr. Cales knew details about the crime scene that were unknown to the public. (Doc. 1 at 35.) This claim apparently refers to Detective Salazar's testimony that news reports published prior to his February 2, 2015 interview with Mr. Cales describing the discovery of Ms. Houston's remains did not include the detail that a burnt bra had been discovered near her gravesite. (Doc. 22, March 18, 2016, Jury trial at 10:02:00-10:02:50.) Mr. Cales did not raise this claim in his direct appeal or amended state habeas petition, so the Court reviews the claim *de novo*. *Douglas*, 560 F.3d at 1170; (*see* Doc. 1; Doc. 21-3 at 136-171.)

In support of his argument, Mr. Cales attached four news articles related to his case. (*See* Doc. 1 at 55-63.) The first and fourth articles post-date Mr. Cales's first interview with the

authorities and are therefore irrelevant to this claim. (*See id.* at 55, 60-63.) The second and third articles, dated January 5, 2015, and January 8, 2015, respectively, both pre-date Mr. Cales's first interview with authorities. (*Id.* at 56-57; *Id.* at 58.) The second article reports that the ground around Ms. Houston's gravesite "seemed to have been burned" and that a "femur and piece of brassiere were removed [from the area] for examination." (*Id.* at 56-57.) The third article similarly reports that the ground around the grave site seemed to be burned. (*Id.* at 58.) However, instead of noting that a "piece of brassiere" had been removed from the area for examination, the third article states that a "piece of undergarment" was removed. (*Id.*)

Mr. Cales has failed to demonstrate that trial counsel's alleged failure to investigate these news articles prejudiced him. Although the news articles described above undercut Detective Salazar's testimony that Mr. Cales had knowledge of details about the crime scene that were not made public, this impeachment would do little to mitigate the harmful impact of Mr. Cales's admission during the interview that he was at a location that matched the crime scene or his unsolicited and preemptive explanation why his DNA might be found at the crime scene after Detective Salazar mentioned seeking a DNA sample. (*See* Doc. 21-2 at 53-58.)

Given the weight of the evidence described in Section III.A., *supra*, and the impact of Mr. Cales's statements to Detective Salazar, there is no reasonable probability the outcome of the trial would have been different had trial counsel effectively impeached Detective Salazar's testimony that Mr. Cales had knowledge of the crime scene that was not made public. I therefore find that Mr. Cales has failed to satisfy the second *Strickland* prong and recommend that the Court DENY Mr. Cales's request for relief on this ground. *See Strickland*, 466 U.S. at 694.

4.    Failure to Question Mr. Cales About Writings that Accompanied his Drawings

Mr. Cales next asserts in his Petition that trial counsel provided him ineffective assistance by failing to "question [him] about the writings that went with the drawings introduced into evidence by the State that showed [his] 'movie idea.'" (Doc. 1 at 34.)  Mr. Cales raised a similar argument in his amended state habeas petition, asserting that trial counsel provided him ineffective assistance by failing to question Mr. Cales about the drawings seized from his jail cell, noting that "the drawings had nothing to do with the murder of Ms. Houston and were the subject of a storyboard/movie idea."  (Doc. 21-3 at 146.) The state district court did not specifically address these arguments, stating only that Mr. Cales had made an "insufficient showing that additional pre-trial investigation … would have altered the course of the proceedings." (Doc. 21-3 at 277.)

Although Mr. Cales does not describe the basis of his "movie idea" in this Petition, the record contains a copy of a handwritten page with the title "Movie Idea" written at the top. (Doc. 21-1 at 70.) The contents of that page are reproduced below:

> Childhood: moving a lot, hillbilly/native background, fathers side ok, mothers not, picked on by xtians for not being xtian.
>
> later: military, college, not wanting civil. but thinking I had to, continuing native beliefs, married but not in love (can't do it), kids, divorce.
> Head to NM. Meet Gus, go to Mesa camp 3 peaks—back—then back 2 3 peaks—all Knew (Brandon, Johnny, Gus, Stan, Kyle, Helen). Blackout between beginning [and] dirt. finding bone [and] burnt bra on 2 [peaks.]
>
> Then to Thebo's and why: Meet Tewa [and] story. Add discovery packet etc. Tell Thebo story of New Agers, etc.
>
> Glory Hand, English Tony, Sparky, Thebes.
>
> Speaking in tongues, feel fear, her eyes rolled back holding knife, have gun, in bus, watching, lunges, fall back, she snaps back.
>
> Chair underside torn out.

> Hear Brandon morning after Johnny gets back. On 2 peaks, witches all over 2 peaks area, she practiced witchery. Holding hands over my head, eyes closed-mouth moving.

(*Id.*)

Although Mr. Cales asserts that counsel was ineffective in failing to investigate possible testimony that his drawings were benign, the drawings and the contents of the page labelled "movie idea," are not exculpatory. Instead, Mr. Cales's "movie idea" tends to corroborate incriminating testimony, such as testimony related to the prosecution's evidence that Mr. Cales had a motive to murder Ms. Houston because she practiced witchcraft, that he had a gun, and that Ms. Houston lived in a bus. Indeed, the page describes a person having a gun while "feel[ing] fear" in the presence of a figure "in bus, watching" who is "[s]peaking in tongues," the presence of witches in "2 peaks," and a female who "practiced witchery" and held hands over the principal character's head, "eyes closed - mouth moving." (Doc. 21-1 at 70.) These details closely mirror Mr. Martinez's testimony regarding statements Mr. Cales made to him that Ms. Houston practiced witchcraft and waved her hands over Mr. Cales while he slept. (*See* Doc. 22, March 16, 2016, Jury Trial at 15:57:50-16:00:05.) Second, many of the background details regarding the principal character in the "movie idea" mirror Mr. Cales's own life, including his background in the military, his claim of Native American heritage and profession of Native American beliefs, his arrival to the Two Peaks region, and the names of people he associated with while living there. (*See* Doc. 21-1 at 70; Doc. 22, March 14, 2016, Jury Trial at 2:45:16-2:45:44, 2:50:43-2:51:09; March 15, 2016, Jury Trial at 2:38:17-2:38:24; 2:48:13-2:50:41.)

Because the "movie idea" page appears to blend autobiographical details with these witchcraft-related incidents, a jury could reasonably infer that the protagonist's fear and possession of a gun in the presence of someone seemingly practicing witchcraft reflected Mr. Cales's actual

27

beliefs and experiences regarding Ms. Houston. Since this evidence could have been harmful rather than helpful to Mr. Cales's defense, trial counsel's failure to investigate and present this evidence cannot be found to have caused the prejudice necessary to support an ineffective assistance claim. *See Strickland*, 466 U.S. at 694. For these reasons, I recommend the Court DENY Mr. Cales's request for relief on this ground.

5.  Failure to Question Mr. Cales about Being Set Up

Mr. Cales asserts in the present Petition that trial counsel provided him ineffective assistance by failing to question him about a conversation he overheard in which three acquaintances on Mr. Thebo's property discussed setting him up for the murder of Ms. Houston. Doc. 1 at 34.) Mr. Cales raised a similar argument in his amended state habeas petition, asserting that trial counsel provided him with ineffective assistance by failing to ask him about his belief that he had been set up for Ms. Houston's murder by three acquaintances. (Doc. 21-3 at 149.)

According to Mr. Cales, in September 2014, he had overheard three individuals on Mr. Thebo's property, identified as "Kyle Goode," "Jerry," and "Eagle," discussing how "bullets that have been fired into a soft spot on 'Cowboy's' property … did not expand" and that they were "going to set up Cowboy and [Mr. Cales.]" (*Id.*) Mr. Cales further argued in his state petition that Mr. Thebo's testimony on cross examination supported his argument. Mr. Cales noted that on cross examination Mr. Thebo acknowledged that "Kyle" told him that "he was looking for [Mr. Cales's] gun and other people in Two Peaks were looking for [Mr. Cales's] gun" a few days after Mr. Cales had left Mr. Thebo's property. (*Id.*; *see* Doc. 22, March 15, 2016, Jury Trial at 4:23:25-4:23:53.)

The state district court rejected Mr. Cales's argument, finding that he had not presented "sufficient information" that "a credible theory exonerating [Mr. Cales] was not explored by [trial] counsel." (Doc. 21-3 at 276.) In making this finding, the state district court noted that trial counsel

28

had maintained Mr. Cales's theory of innocence throughout trial and had cross-examined Mr. Thebo regarding Mr. Cales's set-up theory. (Doc. 21-3 at 276.) Indeed, the record demonstrates that trial counsel investigated Kyle's potential involvement in the case, as evidenced by counsel's cross-examination of Mr. Thebo regarding Kyle's inquiries about Mr. Cales's gun. (*See* Doc. 22, March 15, 2016, Jury Trial at 4:23:25-4:23:53.) Thus, the state district court reasonably rejected Mr. Cales's argument regarding trial counsel's failure to investigate his "set up" theory, and Mr. Cales cannot satisfy *Strickland*'s deficient performance prong.

In an effort to circumvent the fact that counsel's cross examination of Mr. Thebo demonstrated that he was aware of Mr. Cales's "set up" theory, Mr. Cales now appears to reject the argument he raised in the state petition. He asserts in this Petition that if trial counsel had interviewed him about the "set up" theory, counsel would have learned that "Mr. Thebo had nothing to do with the conversation." (Doc. 1 at 34.) However, Mr. Cales does not explain how information that Mr. Thebo's testimony on cross examination was inaccurate would have led to additional exonerating evidence or undermined the evidence supporting his conviction. (Doc. 1 at 34.); *see Strickland*, 466 U.S. at 694. I therefore recommend that the Court DENY Mr. Cales's request for relief on this ground.

6.   Failure to Inform Mr. Cales of his Right to Testify

Mr. Cales asserts that trial counsel's failure to adequately inform him of his right to testify denied him due process, a claim he also raised in his amended state habeas petition. "[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).

> The decision whether to testify lies squarely with the defendant; it is not counsel's decision. Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him. Counsel should

29

also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant. Yet counsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy.

*Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004) (citations omitted), *abrogated on other grounds by Cullen*, 563 U.S. at 170. Mr. Cales argues that "it was [e]rror when [t]rial [c]ounsel told [him] 'you are not testifying' without explanation of why or how it could/would [affect] the trial or [his] rights" and argues further that trial counsel had admitted to barring him from testifying based on the belief that Mr. Cales was mentally ill. (Doc. 1 at 10, 39.) Because a claim based on the right to testify is "best treated as an ineffective-assistance-of-counsel claim," I analyze it under the *Strickland* standard. *Cannon*, 383 F.3d at 1170; *see also Wimberly v. McKune*, 141 F.3d 1187, at *3 (10th Cir. 1998) (brackets omitted) (unpublished) ("Because defense counsel is primarily responsible for advising the defendant of his right to testify[,] the appropriate vehicle for claims alleging that defense counsel violated this right is a claim of ineffective assistance of counsel.").

In support of his right-to-testify claim in his amended state habeas petition, Mr. Cales submitted a description of how he would have testified at trial. (*See* Doc. 21-3 at 280-86.) Specifically, Mr. Cales stated that he would have testified that (1) the drawings referenced in Mr. Martinez's testimony were part of a movie idea and not a depiction of murder; (2) he had overheard a conversation between two people staying on Mr. Thebo's property regarding their plans to set him up; (3) the prosecution mischaracterized the conversation he had with Ms. Houston prior to her disappearance as an argument; (4) he had no ill will towards witches and Mr. Thebo's testimony regarding Mr. Cales's opinions about witches was taken out of context; (5) the writing on the calendar had to do with Mr. Cales's dreams and not the death of Ms. Houston; (6) his failure to speak when Detective Salazar arrested him was related to a stress-induced seizure, and his

30

change of appearance was not related to an attempt to evade the police; (7) he did not have access to a running vehicle after Ms. Houston's disappearance, which would have been necessary to place her body where it was found; and (8) he did not store his pistol in a lockbox when he resided at Mr. Hanson's community. (*Id.* at 282-83.) Mr. Cales's trial counsel also submitted an affidavit regarding Mr. Cales's right-to-testify claim in which he explained that (1) he believed Mr. Cales had a mental health condition that made him incompetent to stand trial and raised this concern with the trial court to no avail; (2) he "did not fully discuss with Mr. Cales … his right to testify on his own behalf"; (3) he was "concerned about [Mr. Cales's] ability to communicate to the court and jury"; and (4) he directed that Mr. Cales should not testify "without full discussion, [input] or [consultation] with Mr. Cales." (*Id.* at 396-98.)

The state district court convened a hearing on this claim on August 5, 2021. (*See* Doc. 22, August 5 Evidentiary Hearing). At the hearing, Mr. Cales and his trial counsel provided testimony that was substantively the same to the statements made in their respective submissions. (*See* Doc. 21-3 at 280-86, 396-98.) Trial counsel also explained that the way Mr. Cales presented at the hearing was substantially different than how he presented at the time of the trial, as Mr. Cales's testimony at the hearing was much more lucid than how trial counsel recalled their previous interactions. (Doc. 22, August 5 Evidentiary Hearing at 4:07:28-4:08:23.)

Following the hearing, the state district court dismissed the right-to-testify claim, finding that while trial counsel provided Mr. Cales ineffective assistance by denying him his right to testify, there was no reasonable probability that the outcome of the trial would have been different had he testified. (Doc. 21-3 at 286-90.) Specifically, the state district court found that while his testimony may have countered certain aspects of the prosecution's evidence, these potential

benefits were substantially outweighed by the risks of cross-examination. (Doc. 21-3 at 289-90.)
The state district court explained:

> The petitioner would have been questioned regarding going to the area where the body was found, how he knew about the bra, why he cleaned the jeep shortly after the victim's disappearance, why he left Taos, why he dramatically changed his appearance, why he gave away the jeep, disposed of the gun, and would have [to] explain the witch hunter story board in the context of testimony that the victim was a witch and he had allegedly expressed a dislike for witches.

(*Id.* at 289-90.) Thus, the state district court ruled that Mr. Cales's testimony could have "made him appear more culpable to the jury" and that therefore there was not a reasonable possibility that his testimony would have changed the outcome of the trial. (*Id.* at 290.) In so ruling, the state district court applied the *Strickland* legal standard, and so on review, I examine whether the state district court unreasonably applied the *Strickland* standard to the facts before it or made an unreasonable determination of those facts.

In this Petition and in the supporting documentation, Mr. Cales has not provided a basis for overturning the state district court's determination on this claim. Rather, Mr. Cales focuses almost exclusively on trial counsel's deficient performance, asserting that at the August 5 hearing, trial counsel "admitted to violating my rights." (Doc. 1 at 10.) Mr. Cales further explains that trial counsel prohibited him from testifying because he believed Mr. Cales was "mentally ill." (Doc. 1 at 39.) However, Mr. Cales offers no argument in this Petition substantiating that he was prejudiced by trial counsel's decision or that the state district court's findings regarding the right-to-testify claim in his amended state habeas petition was contrary to or an unreasonable application of the *Strickland* standard; nor does he suggest that the state district court's findings of fact are unreasonable.

As the state district court noted, if Mr. Cales testified, he would have been subjected to cross examination regarding his knowledge of crime scene details, his suspicious behavior following Ms. Houston's disappearance, his disposal of the alleged murder weapon, and his beliefs about witches. (*Id.*) Moreover, the bulk of the proposed testimony relates to his beliefs about witchcraft, and thus, the state's theory regarding Mr. Cales's motive to kill Ms. Houston. Although Mr. Cales suggested in his amended state habeas petition that such testimony would place his beliefs in context, his proposed testimony would also serve as an admission to certain beliefs about witches and witchcraft, and thus, as the state district court noted in ruling on Mr. Cales amended state habeas petition, may cause the jury to believe him to be more and not less culpable. His testimony and potential cross-examination thus draw more attention to these facts, not less.

Furthermore, during a side bar at Mr. Cales's trial, the state trial court suppressed statements made by Mr. Cales during his second interview with Detective Salazar that he "did not know" whether he killed Ms. Houston and that he "might have." (Doc. 22, March 18, 2016, Jury Trial at 10:51:39-11:01:49.) After the trial court suppressed the statements, trial counsel inquired whether they could be used for impeachment purposes if Mr. Cales testified and denied killing Ms. Houston. (*Id.* at 11:01:50-11:04:45.) The state trial court suggested that she would allow the state to impeach Mr. Cales with the suppressed statement, particularly if he denied culpability for Ms. Houston's murder. (*Id.*) The exchange between trial counsel and the state trial court demonstrates potential inculpatory admissions that could have been used to impeach Mr. Cales during cross examination. Given that Mr. Cales's proposed testimony would have both drawn attention to inculpatory evidence already in the record and possibly, even likely, opened the door to the admission of inculpatory admissions from him, there is not a reasonable probability that the result of the trial would have been different had he testified. *See Cannon v. Trammell*, 796 F.3d 1256,

33

1274-75 (10th Cir. 2015) (holding that prejudice not established when petitioner's testimony would have likely introduced damaging information on cross-examination, such as his escape from custody and prior convictions).

Finally, none of Mr. Cales's proposed testimony undercuts the state's evidence that Mr. Cales took steps to cover-up a crime after Ms. Houston disappeared and later was found killed, including changing his appearance, disposing of his car and his gun, lying to police about owning a gun, or fleeing his residence to avoid a second interview with authorities. The proposed testimony also does not undercut Mr. Cales's own admission to the police that he was at the gravesite. *See Epperson v. Mullin*, 2008 WL 4279800, at \*6 (N.D. Ok 2008) (noting that proposed testimony did not contradict weight of state's evidence); *see also United States v. Farahkhan*, 2001 WL 502510, at \*1 (5th Cir. 2001) (holding that proffered testimony that provided context for petitioner's presence at the crime scene was not sufficient to show that a reasonably likelihood of a different result given strength of other, unrebutted evidence).

Given the strength of the circumstantial evidence described in Section III.A., *supra*, the likelihood that cross examination of Mr. Cales would have elicited damaging facts or made admissible an inculpatory statement by Mr. Cales, and the fact his proposed testimony addresses only a small portion of the circumstantial evidence presented by the state, a fairminded jurist could reasonably conclude that Mr. Cales's proffered testimony would not have been sufficiently helpful to create a reasonable probability of a different verdict. In short, the state habeas court reasonably determined that Petitioner's ineffective assistance claim based on his right to testify fails the prejudice prong of the *Strickland* test. *Lafler*, 566 U.S. at 163; *Strickland*, 466 U.S. at 687-88. For these reasons, I recommend that the Court DENY Mr. Cales's request for relief on this ground.

### C. Prosecutorial Misconduct

Mr. Cales' raises three prosecutorial misconduct claims in his Petition, the first two of which he presented in his amended state habeas petition. Specifically, Mr. Cales argues that his conviction should be overturned due to the prosecution's misconduct in knowingly allowing Mr. Martinez to give false testimony that he (1) saw Mr. Cales's drawings while incarcerated with him, and (2) had not made a deal with the prosecution in exchange for his testimony. (Doc. 21-3 at 167.) He also alleges that (3) the prosecution allowed Detective Salazar to present false testimony regarding Mr. Cales's knowledge of unpublished details of the crime scene, which is purportedly demonstrated by the newspaper articles published on January 5 and January 8, 2015.[13] (Doc. 1 at 35.)

Regarding the first claim, Mr. Cales asserted in his amended state habeas petition that he did not receive the sketchbook he used for the drawings until after Mr. Martinez had been transferred out of his detention facility on April 13, 2015, because there was a delay in his ability to access funds that were placed in his commissary account in late March 2015 and a delay in receiving the sketchbook once he placed the order. (Doc. 21-3 at 147.) In support of this claim, Mr. Cales cited three exhibits. (*Id.*) The first exhibit is a booking report showing that he had no "Cash on Entry" when he was initially incarcerated in February 2015. (*Id.* at 215.) The second exhibit is two letters apparently sent to Mr. Cales by a friend named Steven Hooker dated April

---

[13] The Petition also alleges that the prosecution conspired with Mr. Martinez to create a false "witch killer" narrative. (Doc. 1 at 36.) In support of this allegation, Mr. Cales states that Mr. Martinez told police that Ms. Houston's hands were missing from the gravesite and that Mr. Cales had told him a witch's hands must be cut off to break her spell. (*Id.*; *see* Doc. 21-1 at 50. 53.) Mr. Cales further alleges that a deputy district attorney was quoted as saying that Mr. Martinez reported the hands were missing, despite no evidence indicating that Ms. Houston's hands had been forcibly removed. (Doc. 1 at 36.) However, the prosecution never presented evidence that Ms. Houston's hands had been removed. (*See generally* Doc. 22.) Because this allegation fails to raise a cognizable prosecutorial misconduct claim related to false testimony, and because Mr. Cales presents no other clear theory of prosecutorial misconduct related to this evidence, I will not address this assertion further. *See Garrett*, 425 F.3d at 840.

25, 2015, and July 7, 2015, as well as a cover letter from Mr. Hooker addressed to "Amanda" dated May 19, 2019. (*Id.* at 216-219.) In the cover letter, Mr. Hooker states that "[t]he letter from April of 2015 mentions the money I sent Ivan Cales at the very end of March in 2015. There was a typical lag time of 7 days, so Ivan would not have received the money until early April" and that "[t]he letter from July has the first mention of any Art Work or Drawings he made." (*Id.* at 216.) The April 2015 letter states "I am so relieved you got the money order I sent," but does not state when the money order was sent or received. (*Id.* at 217.) The July 2015 letter mentions that Mr. Hooker received a letter containing Mr. Cales's sketches on July 6, 2015. (*Id.* at 219.) The third exhibit is a booking report for Mr. Martinez showing his release date as April 13, 2015. (*Id.* at 220-21.)

In support of his second claim, Mr. Cales asserted that, "shortly after Mr. Martinez was released, he had been brought back to jail and began yelling 'you can't do this. We had a deal! We had a deal!' then the CO escorted him out of the pod and he was released." (*Id.* at 167.) He also filed exhibits showing that Mr. Martinez's arraignment order entered March 17, 2015, had set his bond at $100,000 and that the bond amount was reduced to $50,000 on February 25, 2016, "upon [Mr. Martinez's] motion to review the bond and conditions of release." (*Id.* at 223-26.)

The state district court found that Mr. Cales had failed to substantiate either claim. Regarding the first claim, the state district found that

> [t]he sketchbook that is alleged to have been used for the drawings was purchased at the end of March of 2015 and Martinez was released on April 13, 2015. The time prior to Martinez's release appears to overlap at least for a period of several days. Additionally, if Martinez was released prior to the pictures being created, he would not have known of their existence.

36

(Doc. 21-3 at 276.) The state district court did not directly address Mr. Cales's second claim but stated that "[t]here [was] an insufficient showing that prosecutorial misconduct was present in the trial of the petitioner and or [sic] that the alleged improprieties impacted the verdict." (*Id.* at 279.)

The United States Supreme Court has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" and that the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015).

Regarding the two claims raised in his amended state habeas petition, Mr. Cales has failed to make a sufficient showing of the state district court's error in finding no prosecutorial misconduct. "[T]he factual findings of the state court are [presumed] correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Welch*, 639 F.3d at 991; *see also* 28 U.S.C. § 2254(e)(1); Part II.A., *supra*. Here, Mr. Cales's evidence does not clearly and convincingly rebut the state district court's finding that Mr. Cales had his sketchbook while still incarcerated with Mr. Martinez. His booking report showing he had no cash on entry does not definitively show he did not receive funds from other sources during his incarceration. (Doc. 21-3 at 215.) Moreover, Mr. Hooker's letters fail to provide definitive proof of the relevant timeline, as the April 2015 letter does not specify when the money order was sent, and the July 2015 letter provides no information about when the sketchbook was ordered or received, leaving gaps that allow for the possibility that Mr. Martinez could have observed the drawings in the sketchbook before his April 13, 2015, release. (Doc. 21-3 at 216-21.) Without clear and convincing evidence

to overcome the presumption of correctness afforded to the state court's factual findings, Mr. Cales has not established that he is entitled to federal habeas relief based on Mr. Martinez's allegedly false testimony regarding the drawings. *See Welch*, 639 F.3d at 991; 28 U.S.C. § 2254(e)(1)

Similarly, Mr. Cales has failed to present clear and convincing evidence that Mr. Martinez received prosecutorial consideration in exchange for his testimony to contradict the state district court's findings. First, Mr. Cales's statement that Mr. Martinez yelled about having "a deal" is self-serving and lacks any corroboration. (*See* Doc. 21-3 at 167.) Furthermore, the bond reduction from $100,000 to $50,000 occurred on February 25, 2016—a month before Mr. Martinez testified at Mr. Cales's March 2016 trial. (Doc. 21-3 at 225-26.) This timing undermines rather than supports Mr. Cales's theory since it would be unlikely for the prosecution to provide a bond reduction as part of a deal before receiving the testimony in return. Because Mr. Cales has not met his burden to rebut the state court's factual determinations with clear and convincing evidence, he has failed to establish that the prosecution knowingly presented false testimony or engaged in misconduct warranting federal habeas relief. *See* 28 U.S.C. § 2254(e)(1). Accordingly, I recommend the Court DENY Mr. Cales's request for relief on these grounds.

Finally, Mr. Cales's allegation that the prosecution knowingly allowed Detective Salazar to give false testimony regarding Mr. Cales's knowledge of unpublished crime scene details was not previously raised in state court, so the Court must review it *de novo*. *Douglas*, 560 F.3d at 1170. To establish prosecutorial misconduct under *Napue*, Mr. Cales must demonstrate that Detective Salazar committed perjury and that the prosecution knew the testimony to be false. *Garcia*, 793 F.3d at 1207. Mr. Cales has failed to make either showing. While the newspaper articles Mr. Cales provided may contradict Detective Salazar's testimony about the bra detail being unpublished, (*see* Doc. 1 at 55-63), there is no evidence in the record showing that Detective

38

Salazar deliberately provided false testimony or that the prosecution was aware of these articles at the time of trial. Without this evidence, Mr. Cales cannot establish a *Napue* violation. *See Garcia*, 793 F.3d at 1207. I therefore recommend that the Court DENY Mr. Cales's request for relief on this ground as well.

## D.  Erroneous Admission of Evidence

In his direct appeal, Mr. Cales asserted that the trial court erroneously admitted Mr. Martinez's testimony recounting Mr. Cales's belief that Ms. Houston was a witch and identifying his drawings, one of which Mr. Cales described as depicting "a person slaying a witch."[14] (Doc. 21-2 at 151-52.) Mr. Cales argued that this testimony violated New Mexico Rule of Evidence 11-404(A) because its sole purpose was to support the inference that "Mr. Cales killed Ms. Houston in conformity with his character." (*Id.* at 152); *see* N.M. R. Evid. 11-404(A)(stating that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait"). The New Mexico Supreme Court rejected this argument, finding that Mr. Martinez's testimony:

> was not offered to prove that Cales had a propensity to kill witches, that his belief in witchcraft was evidence of a murderous nature, or that he was in some way morally flawed as a consequence of his belief that witches should be killed. Rather, Martinez's testimony was offered to establish that Cales had a specific reason to kill this particular victim and that, when he did so, he acted with deliberate intention.

(Doc. 21-2 at 14.) Mr. Cales reiterates this erroneous admission of evidence claim in the present Petition. (Doc. 1 at 8, 38.)

Federal habeas corpus relief generally does not extend to review of state court evidentiary determinations. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Bullock v. Carver*, 297 F.3d 1036,

---

[14] *See* Note 9, *supra*.

1055 (10th Cir. 2002). Federal courts may only intervene when a state court's evidentiary ruling "was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Hooker v. Mullin*, 293 F.3d 1232, 1238 (10th Cir. 2002) (quoting *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997)). The petitioner therefore faces a substantial burden and must show the state's departure from its own law was constitutionally arbitrary to a degree that would "shock the judicial conscience." *Aycox v. Lytle*, 196 F.3d 1174, 1180 (10th Cir. 1999).

Here, Mr. Cales has failed to demonstrate that the New Mexico Supreme Court's evidentiary ruling was so fundamentally unfair as to warrant federal habeas relief. The testimony regarding Mr. Cales's beliefs about witches and his drawing of a "witch hunter" was relevant to establish his motive for killing Ms. Houston and his deliberate intent in carrying out what he allegedly viewed as justified conduct based on his professed Native American beliefs. (Doc. 22, March 16, 2016, Jury Trial at 3:52:59-3:54:41, 3:51:45-3:57:46; Doc. 22, March 15, 2016, Jury Trial at 2:48:08-2:50:21, 3:52:37-3:54:25.) Accordingly, the New Mexico Supreme Court's determination that Mr. Martinez's testimony was admissible to establish motive and deliberate intent, rather than to prove character conformity, represents a reasonable application of state evidentiary law that does not shock the judicial conscience. (*See* Doc. 21-2 at 250-51); N.M. R. Evid. 11-404. Mr. Cales's argument fails to satisfy the applicable legal standard, and I therefore recommend the Court DENY relief on this ground. *See Hooker*, 293 F.3d at 1238.

## IV. CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY Mr. Cales's Petition

(Doc. 1) and DISMISS the Petition WITH PREJUDICE.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

41